966 F.2d 1453
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Larry R. MOTT; Sharon K. Mott, Individually and as Next
Friend of Lisa and Ginger Mott, Plaintiffs-Appellees,
v.
SCHELLING AND COMPANY, a Foreign Limited Partnership with
Franzjorg Schelling as its General Partner,
Defendant-Appellant,
and
Knape and Vogt Manufacturing Company, a Delaware
Corporation, Defendant.
 No. 91-1540.
 United States Court of Appeals, Sixth Circuit.
 May 29, 1992.
 
 Before BOGGS and ALAN E. NORRIS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Larry Mott and his wife, Sharon Mott, individually as a next friend of their daughters Liza and Ginger Mott, filed this product liability action against Knape and Vogt Manufacturing Company, a Delaware corporation ("Knape and Vogt"), and Schelling and Company ("Schelling"), a foreign limited partnership with its principal place of business in Schwartzach, Austria. Knape and Vogt owns Modar, Inc., the Michigan Corporation that employed Larry Mott. Larry Mott was injured on the job by a saw manufactured by Schelling.
 
 
 2
 After a trial, the jury returned a verdict of $2,335,000, not including costs and interest, in favor of Mott and his family. The district court entered a final judgment in the amount of $4,390,730. Schelling appeals two decisions made by the district court. First, Schelling contends that the district court should not have exercised personal jurisdiction over it because the contacts between the Austrian limited partnership and the State of Michigan were insufficient to justify personal jurisdiction. Second, Schelling argues that the district court erred in ordering Schelling's general partner, Franzjorg Schelling, an Austrian citizen, to submit to a deposition concerning his personal assets and the assets of the partnership. For the reasons given below, we affirm the judgment of the district court.
 
 
 3
 * Larry Mott was seriously injured while operating an industrial panel saw at the Modar plant in Benton Hills, Michigan. This saw was designed and manufactured by Schelling. It is a large industrial saw used to cut bulky, oversized panels of wood. The saw was designed with a heavy aluminum bar that lowers from overhead to press the wood panels into place so that they can be cut. The saw was also designed to allow the blade to be changed when necessary. It was during one such blade change that Mott was injured.
 
 
 4
 During the blade change, the saw's heavy aluminum bar is raised to its highest point. The bar is intended to depress a switch, which in turn is supposed to activate a hydraulic pressure lock that should prevent the bar from descending while the blade is being changed. In order to change the blade, the saw operator must position himself beneath the aluminum bar. Following a demonstration of the saw by a Schelling technician when it was originally installed, Modar added an additional safety bar to the saw that was intended to prop up the aluminum bar and prevent it from falling during the blade change procedure.
 
 
 5
 On October 3, 1983, a co-worker asked Larry Mott to help him change the blade on the Schelling saw. Mott had extensive experience with the saw and had changed the blade an estimated 5,000 times over a five year period. On that day, however, the saw's heavy aluminum bar failed to activate the hydraulic safety switch, causing the aluminum bar to descend onto the safety bar under pressure. Unfortunately, the safety bar slipped out from under the aluminum bar, and the bar fell forcefully onto Mott's head, resulting in catastrophic injuries.
 
 
 6
 The Motts filed this suit against Schelling, the manufacturer of the saw, and Knape and Vogt, a Delaware corporation that owned Modar, Inc., which is a Michigan corporation and Mott's employer. In their amended complaint, the Motts alleged that Schelling had negligently designed and manufactured a saw that was unreasonably dangerous for its foreseeable use, negligently failed to warn of the saw's dangers, and negligently failed to provide an adequate safety system. The complaint also alleged that Knape and Vogt negligently failed adequately to inspect, test, and provide for the safe operation of the saw, negligently failed to provide the saw with an adequate safety device, and negligently failed to inform operating personnel of safe methods to be used in the blade-changing procedure. The complaint further alleged that both Schelling and Knape and Vogt breached express and implied warranties.
 
 
 7
 Schelling filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), arguing that its contacts with the State of Michigan were not sufficient to support personal jurisdiction. Schelling claimed to have transferred title to the saw to its exclusive distributor, the Proctor Corporation of Birmingham, Alabama. It was the Proctor Corporation that ultimately sold the saw to Knape and Vogt, Modar's parent corporation. Discovery on the personal jurisdiction issue was conducted and the Motts filed a response to Schelling's motion. The district court ultimately denied Schelling's motion without opinion on July 8, 1987. Schelling expressly preserved the issue for appeal in the pre-trial order. On June 22, 1987, Knape and Vogt was dismissed from the case.
 
 
 8
 Shortly before the trial began, the Motts learned that Schelling's general partner, Franzjorg Schelling, an Austrian citizen, would be attending the trial. The Motts filed a motion to depose Mr. Schelling concerning his company's assets. The district court took the motion under consideration and started the trial. Immediately before submitting the case to the jury, the court ordered Mr. Schelling to present himself to the plaintiff's counsel for the assets deposition. This order apparently caused Mr. Schelling to leave the United States and return to Austria. Mr. Schelling was, therefore, not present at counsel table during closing arguments. Schelling appeals, claiming that the court erred in ordering the deposition and that the error deprived Mr. Schelling from participating meaningfully in the trial and thus prejudiced his case in the eyes of the jury. We will treat each of Schelling's assignments of error in turn.
 
 II
 
 9
 We review challenges to a court's exercise of personal jurisdiction de novo. Such challenges present a question of law, founded on the Due Process Clause. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-73 (1985). In this case, the district court exercised personal jurisdiction over Schelling pursuant to the applicable Michigan long-arm statute, M.C.L. 600.725, which provides, in pertinent part:
 
 
 10
 The existence of any of the following relationships between a partnership or a limited partnership or an agent thereof and the State shall constitute a sufficient basis of jurisdiction to enable the courts of record of this State to exercise limited personal jurisdiction over such partnership and to enable such courts to render personal judgments against such partnerships or a limited partnership arising out of the act or acts which create any of the following relationships:
 
 
 11
 (1) The transaction of any business within the state.
 
 
 12
 (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in a action for tort.
 
 
 13
 .............................................................
 
 
 14
 ...................
 
 
 15
 * * *
 
 
 16
 (5) Entering into a contract for services to be performed or for materials to be furnished in the state by the Defendant.
 
 
 17
 "In determining whether it can assert personal jurisdiction over a nonresident defendant in a diversity case, a district court must apply the law of the state in which it sits, subject to due process limitations." Creech v. Roberts, 908 F.2d 75, 79 (6th Cir.1990). The Michigan long-arm statute applies in this case and, in general, that statute confers on courts "the maximum scope of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment."[1] Chrysler Corp. v. Fedders Corp., 643 F.2d 1229, 1236 (6th Cir.), cert. denied, 454 U.S. 893 (1981); Theunissen v. Matthews, 935 F.2d 1454, 1462 (6th Cir.1991); Chandler v. Barclays Bank PLC, 898 F.2d 1148, 1150-51 (6th Cir.1990); LAK Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1298 (6th Cir.1989), cert. denied, 110 S.Ct. 1525 (1990); Michigan Nat. Bank v. Quality Dinette, Inc., 888 F.2d 462, 464 (6th Cir.1989); Hertzberg & Noveck v. Spoon, 681 F.2d 474, 478 (6th Cir.1982). The issue before us, then, is whether the exercise of personal jurisdiction by the district court in this case comports with the constitutional requirements of due process.
 
 
 18
 Due process requires that in order for a court to exercise personal jurisdiction over a defendant, the defendant must have certain minimum contacts with the jurisdiction such that maintenance of the lawsuit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The Supreme Court has discussed the purpose of the due process requirement as follows:
 
 
 19
 By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit."
 
 
 20
 Burger King, 471 U.S. 462, 472 (1985) (quoting Shaffer v. Heitner, 433 U.S. 186, 218 (Stevens, J., concurring) and World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). This "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities toward the forum state and the alleged injuries "arise out of or relate to" those activities. Ibid. (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984) and Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)). A court does not offend the Due Process Clause if it exercises personal jurisdiction over a company that "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State' and those products subsequently injure forum consumers." Id. at 473 (quoting World-Wide Volkswagen, 444 U.S. at 297-98).
 
 
 21
 In determining whether personal jurisdiction exists, then, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum state." Id. at 474. In other words, the defendant's conduct and connection with the forum state must be such that he should "reasonably anticipate being haled into court there." World-Wide Volkswagen, 444 U.S. at 297. There must be some act by which the defendant purposefully avails itself "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). Further, even a single act can support jurisdiction as long as it creates the required relationship with the forum state. McGee v. International Life Insurance Co., 335 U.S. 220, 223 (1957).
 
 
 22
 Finally, the Supreme Court has also held that apart from the minimum contacts analysis, a court may also consider other factors to determine whether the exercise of personal jurisdiction would be consistent with the "fair play and substantial justice" requirement of International Shoe. Burger King, 471 U.S. at 476. There are certain considerations, for instance, that could sometimes establish jurisdiction on a lesser showing of minimum contacts than would otherwise be required. Id. at 477. These factors include the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interests of the several states in furthering substantive social policies. World-Wide Volkswagen, 444 U.S. at 292. Similarly, the concept of "fair play and substantial justice" may defeat jurisdiction even where a defendant has purposely engaged in forum activities, although such a showing will normally be quite difficult. Burger King, 471 U.S. at 477-78.
 
 
 23
 A number of years ago, this Circuit set out its test for personal jurisdiction. This court's formulation has survived the test of time and several Supreme Court cases addressing this issue. Historically, we have applied the following criteria in determining whether personal jurisdiction has been properly exercised by a district court:
 
 
 24
 First, the defendant must purposefully avail himself of the privilege of acting in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.
 
 
 25
 Southern Machine Co. v. Mohasco Indust., 401 F.2d 374, 381 (6th Cir.1968). Our statement in Mohasco still accurately summarizes the law in this area. As we have stated on many previous occasions, "[p]urposeful availment by the defendant of the privilege of acting in, or causing consequence in, the forum state is 'the sine qua non of in personam jurisdiction.' " Theunissen, 935 F.2d at 1460 (quoting Mohasco, 401 F.2d at 381-82). Further, an inference of reasonableness arises when the first two criteria of the test are met. Once the first two criteria are met, therefore, only the most unusual case will fail to meet the third criterion as well. American Greetings Corp. v. Cohn, 839 F.2d 1164, 1170 (6th Cir.1988); Theunissen, 935 F.2d at 1461.
 
 
 26
 In this case, Schelling argues that it had virtually no contact with the state of Michigan and, in any event, not sufficient contact to support the district court's exercise of personal jurisdiction. Schelling admits that it designed and manufactured the saw that injured Mott, but denies having sold the machine to Mott's employer, Modar, Inc. Schelling contends that it sold the saw to the Proctor Corporation of Birmingham, Alabama and title to the saw passed to Proctor when it received the machine. Schelling complains, then, that it had no connection with Michigan and cannot be haled into court in that state consistent with the Due Process Clause.
 
 
 27
 A more complete statement of the facts in this case, however, supports the district court's exercise of jurisdiction over Schelling. As stated, Schelling's plant and headquarters is located in Austria. However, Schelling sells saws and other industrial equipment all over the word. Schelling has always maintained an exclusive American sales agent for the sale and resale of its specialized product in the American market. Schelling sold the saw at issue in this case through the Proctor Corporation, its exclusive sales agent during the relevant time period. Proctor is no longer in business. Over the years, Schelling also used exclusive United States distributors in Wisconsin, Pennsylvania, and North Carolina. Currently, Schelling's distributor is Intech, Inc., of Massachusetts. Proctor performed various services on behalf of Schelling, including installation and repair as well as trade-in and resale of used models. As Schelling changed American sales agents, these services became available to prior customers through the new distributors.
 
 
 28
 Schelling actively cultivated its American market. United States standards were taken into account in the design and manufacture of the saw at issue. Schelling employees, including Franzjorg Schelling himself, have come to the United States to market and sell these machines. Schelling brochures have also been disseminated. During the years 1965 through 1975, Schelling sold six of these saws through its U.S. distributors. An average of three saws were sold each year during the years 1976 through 1980. The prices for the saws varied from $35,000 to $57,000. Most of the machines sold in the United States were installed by Schelling fitters. Schelling technicians also came to the United States to conduct inspections, testings and adjustments of the machines.
 
 
 29
 Modar, Mott's employer, bought two of the Schelling saws and both are still in operation at its Michigan plant. Technically, these saws were sold to Knape and Vogt, Modar's parent, by Proctor, since title to the saws passed to Proctor when Schelling shipped them to the United States. However, the passing of title to Proctor and then immediately to Modar is an artifice that is unhelpful for the personal jurisdiction analysis. American customers could only acquire Schelling saws through Proctor. However, Schelling did not ship the machines to Proctor unless a sale had already been made. Schelling would send a saw to the United States, then, only after its sales agent Proctor had sold the machine. In general, the saw and title to it would be sent to Proctor, and then both immediately transferred to the purchaser. Such was the case here. In addition, a Schelling technician went to the Modar plant to install the saw at issue and demonstrated the blade change procedure.
 
 
 30
 These facts clearly satisfy both the Michigan long-arm statute and the requirements of due process, which are coextensive in this case. Schelling's actions established the requisite "minimum contacts" with the state. The Company purposefully availed itself of the opportunity to sell its saws in Michigan. Despite the technical structure of the transaction, Schelling certainly did not expect that all of its saws would remain in Alabama once title passed to Proctor. The evidence establishes that Schelling used Proctor as a distributor, and that title only passed through the hands of this sales agent on the way to the ultimate purchasers of Schelling saws. It also seems that Schelling knew the ultimate destination of each saw. Schelling had to know that the saw was going to Michigan since it sent one of its technicians to install and demonstrate the Machine. We have held that "the use of an independent distributor so that the manufacturer is only indirectly responsible for the product reaching an injured consumer, in and of itself, will not insulate an nonresident foreign corporation from suit." Poyner v. Erma Werke Gmbh, 618 F.2d 1186, 1190 (6th Cir.1980). In other words, Schelling cannot avoid liability for the injuries caused by its product by creating a paper transfer through a middleman. Liability is not cut off by creating the illusion of a sale to Proctor.
 
 
 31
 Schelling knew its saws were being sold in the United States. The company actively cultivated its market here, and benefited from numerous U.S. sales, including the one in this case, over many years. Clearly Schelling cannot reasonably expect to sell a potentially dangerous product into the United States, exact its price, and then shirk any obligations that arise when its machine goes awry. Due process does not require us to allow Schelling to exploit this country's vast, rich markets and at the same time avoid the jurisdiction of our courts. Under any formulation of the test, the district court properly exercised personal jurisdiction over Schelling.
 
 
 32
 In addition, while Schelling points this court to the Supreme Court's decision in Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102 (1987), we find that case inapposite. In Asahi, a California resident brought a product liability suit in California state court against a Taiwan company that had manufactured a defective motorcycle tire. The Taiwanese defendant impleaded the Japanese manufacturer of the tire valve stem, Asahi Metal Industries Co., seeking indemnification. The primary suit was settled, leaving only the third party action. The Supreme Court held that due process would not allow California to exercise personal jurisdiction over Asahi. To state these facts is to illustrate their glaring differences from the circumstances of this case.
 
 
 33
 The Supreme Court in Asahi found that California had very little interest in exercising personal jurisdiction in the case. The California citizen had already obtained relief and the remaining plaintiff was not a California citizen. The transaction in the case had taken place in Taiwan, so Asahi's contacts with California were quite attenuated. The court ultimately held that the minimal interest of the state did not outweigh the serious burden that would be placed on Asahi by requiring it to defend itself in California. In this case, however, Michigan has a strong interest in exercising jurisdiction over Schelling. Schelling placed its own product directly into the state of Michigan, albeit via Alabama. Schelling's contacts with Michigan are far more direct than Asahi's contacts with California. In addition, Schelling's product injured a Michigan citizen, who will be denied relief if he cannot obtain it "conveniently and effectively" from the foreign manufacturer of that product. In sum, even given Asahi, Michigan's exercise of personal jurisdiction over Schelling was reasonable. (For an indepth discussion of Asahi and its ramifications, see Theunissen, 935 F.2d at 1461-62).
 
 III
 
 34
 The second issue raised by Schelling concerns the assets deposition ordered by the court just before the case was submitted to the jury. As explained above, news of this order apparently caused Franzjorg Schelling to leave the United States. As a result, he was unable to be present in the courtroom for closing arguments. Appellant contends that this absence prejudiced Schelling's case in the eyes of the jury. In addition, appellant contends that because Mr. Schelling was en route to Austria, his attorneys were unable to reach him so that he could consider an eleventh-hour settlement offer made by the plaintiffs after the case had been submitted to the jury. This settlement offer was only a fraction of the ultimate jury award against Schelling. Schelling claims, therefore, that this allegedly errant order caused it great harm.
 
 
 35
 We begin our analysis by pointing out that none of the supposed adverse effects of the court's order were caused by the order itself, but rather by Mr. Schelling's seemingly extreme reaction to that order. The court's decision to grant the order was prompted by suspicions that Schelling had not been candid concerning its United States operations, assets, and its various insurance policies. In addition, since Schelling is an Austrian concern, both the court and the Motts anticipated difficulty in collecting any forthcoming jury award. Ultimately, the court granted the Mott's motion to compel the deposition pursuant to Federal Rule of Civil Procedure 64, which provides:
 
 
 36
 At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held.... The remedies thus available include arrest, attachment, garnishment, replevin, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.
 
 
 37
 The district court found the discovery sought by the Motts, to secure satisfaction of any judgment ultimately rendered in their favor, to be an "equivalent remedy" provided for by Michigan law.
 
 
 38
 The district court relied on a Michigan Court of Appeals case, McLaren v. Zeilinger, 103 Mich.App. 22, 302 N.W.2d 583 (1981). In McLaren, the Michigan Court of Appeals affirmed the trial court's refusal to sustain objections to interrogatories regarding the defendant's financial condition. The court found that the following circumstances justified permitting such discovery: (1) the recommendation of a mediation panel had placed a substantial value on the plaintiff's damages; (2) there was a real possibility of a jury award exceeding the defendant's insurance policy limits; and (3) discovery of the defendant's assets could be a factor in inducing settlement.
 
 
 39
 The court held that, under McLaren, Michigan law authorized prejudgment discovery of this information in "exceptional circumstances" and that the requisite exceptional circumstances existed in this case. Here, Mott had sustained a severe injury and the possibility existed that the jury would render a verdict that would exceed the limits of Schelling's Austrian insurance policy. Further, the court found important the fact that Austria does not participate in the Hague Convention on taking evidence abroad in civil or commercial matters. See 28 U.S.C. § 1781 et seq. Therefore, there was a real possibility that any judgment in excess of the insurance limits would be meaningless since the court would have no effective means of compelling Schelling and Company or Mr. Schelling to cooperate in discovery in aid of execution. The court did not want Schelling to be able to escape its obligations because its home country was not a signatory to the Hague Convention, so it allowed the limited deposition.
 
 
 40
 We find that the district court did not abuse its discretion in ordering the deposition, given Michigan law and the circumstances of this case. More importantly, perhaps, is the fact that any alleged error on this issue would have been found harmless anyway. The purported adverse consequences here were not caused or compelled in any sense by the action of the district court. Any harm was caused by Franzjorg Schelling, who chose to leave the country rather than submit to the court-ordered discovery. In other words, Mr. Schelling made his own, albeit uncomfortable, bed.
 
 IV
 
 41
 For the reasons given, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 It has been suggested that, in certain circumstances, the Michigan long-arm statute may not extend to the limit permitted by the federal constitution. See, e.g., Theunissen v. Matthews, 935 F.2d 1454, 1462 (6th Cir.1991); LAK, Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1298 n. 4 (6th Cir.1989). These cases, however, involve situations where a Michigan plaintiff's injuries occur out of the forum state (and sometimes out of the country), but where the defendant still has some minimal contact with Michigan. The injury in this case took place in Michigan and was caused by a product sold and transported into the state. In these circumstances, the Michigan statute reaches as far as the Due Process Clause will allow