*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FORTIS CORPORATE INSURANCE,

*Plaintiff-Appellant,*

*v.*

No. 05-3792

VIKEN SHIP MANAGEMENT, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 04-07048—James G. Carr, Chief District Judge.

Argued: March 7, 2006

Decided and Filed: June 8, 2006

Before: SUTTON and GRIFFIN, Circuit Judges; OBERDORFER, District Judge.[*]

---

## COUNSEL

**ARGUED:** David T. Maloof, MALOOF, BROWNE & EAGAN, Rye, New York, for Appellant. Henry E. Billingsley, II, TUCKER, ELLIS & WEST, Cleveland, Ohio, for Appellee. **ON BRIEF:** David T. Maloof, MALOOF, BROWNE & EAGAN, Rye, New York, for Appellant. Henry E. Billingsley, II, TUCKER, ELLIS & WEST, Cleveland, Ohio, for Appellee.

---

## OPINION

---

OBERDORFER, District Judge. In this maritime shipping case, we consider whether the district court properly ruled that it lacked personal jurisdiction over defendants-appellants Viken Lakers A/S and Viken Ship Management A/S ("VSM"). These two Norwegian companies own and manage a fleet of ocean-going cargo vessels. In 1998, defendants entered a Time Charter Agreement with FedNav International (a Canadian company). The agreement chartered to FedNav a fleet of vessels, including the M/V Inviken, for a period of several years[1] to transport cargo on an as-needed basis. FedNav subchartered the M/V Inviken to Metallia LLC (a U.S. company) to carry

---

[*] The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

[1] Fortis states that the agreement was for a term of five years (see Appellant Br. 1), but the Charter Agreement appears on its face to be for nine years. *See* JA 108 (Charter Agreement).

1

a specific cargo of steel coils from Szczecin, Poland to Toledo, Ohio. En route seawater entered the cargo hold of the M/V Inviken, causing severe rust damage to the coils. Plaintiff-Appellant Fortis Corporate Insurance, a Belgian company, is a surrogate insurance underwriter of Metallia. Fortis paid $375,000 to resolve Metallia's insurance claim.

On February 2, 2004, Fortis sued defendants in the U.S. District Court for the Northern District of Ohio, which district includes Toledo, for damages allegedly caused by negligence and breach of bailment obligations.[2] In their answer, defendants maintained that the district court lacked personal jurisdiction over them. However, the court allowed Fortis to conduct discovery to demonstrate, if it could, that jurisdiction existed.

On October 15, 2004, defendants moved for summary judgment dismissing the suit on the theory that the federal court in Toledo lacked personal jurisdiction over defendants. On March 16, 2005, the district court granted this motion. *See Fortis Corporate Ins. v. M/V Inviken, et al.*, 2005 WL 646092 (N.D. Ohio Mar. 16, 2005). The court then granted Fortis' motion for voluntary dismissal of its amended complaint. On May 17, 2005, the district court entered an Order of Final Judgment. On June 6, 2005, Fortis filed its timely Notice of Appeal.

On appeal we review de novo the district court's dismissal of the case for lack of personal jurisdiction, *see Southerland v. Wofford*, 894 F.2d 408 (6th Cir. 1990), and we reverse.

## I.    Facts

The undisputed evidence generates the following undisputed facts:

### A.    FedNav

Third party FedNav, based in Montreal, Canada, is a well-known steel commodity carrier in the Great Lakes region. According to a declaration by Donald Frost, a marine transportation consultant:

> It is a matter of widespread general knowledge within the maritime chartering industry that Fednav['s] primary business is the carriage of international cargoes to and from the Great Lakes, including numerous United States ports, via the St. Lawrence Seaway. Fednav is also known for calling especially at Great Lake ports that receive steel cargoes, such as the port of Toledo, Ohio. In fact, according to the Fednav website, a link to which is contained on the website of Defendant Viken Ship Management, Fednav International Ltd. is the largest international user of the St. Lawrence Seaway system. The St. Lawrence Seaway is, of course, the only direct access to the Great Lakes by ship.

Frost Decl. ¶¶ 5-6 (JA 158). Defendants did not offer any evidence in rebuttal.

### B.    The Viken Defendants

Undisputed facts confirm Frost's declaration; defendants' vessels called at U.S. ports (including Toledo) frequently:

- According to a listing of port calls, defendants' vessels called at U.S. ports 172 times between January 1999 and March 2004, or nearly three times a month. Two-thirds

---

[2]Plaintiff also originally sued the vessel M/V Inviken and a predecessor ship management company, Vista Ship Management. Plaintiff subsequently dismissed M/V Inviken and Vista Ship Management as parties.

of these calls (114) were at U.S. Great Lake ports, and 29 of these calls were at Ohio. *See* Frost Decl. ¶¶ 10-11 (JA 159-160); *see also* JA 247-276 (listing of all port calls for Viken Laker vessels, January 1999 - March 2004).

- During this same period, the Laker vessels spent a total of 62 days at Ohio ports. *See* Frost Decl. ¶ 13 (JA 160). The Charter Agreement provides that the rate to charter a vessel is $9,000 per day minimum. *See* JA 108 (Charter Agreement). As a result, defendants earned a total of at least $558,000 for the number of days spent in Ohio ports during this period.

- Similarly, defendants' vessels spent 572 days in U.S. ports. At a rate of at least $9,000 per day, defendants earned at least $5,148,100 for time spent in U.S. ports. *See* Frost Decl. ¶ 13 (JA 160).

- The VSM website, in describing its contingency plans for any environmental disasters, states that it makes "[f]requent calls to the USA and Canada, including the Great Lakes[.]"

## C.    The Charter Agreement

The Charter Agreement between the Viken defendants and FedNav could fairly be characterized as anticipating issues and problems that would arise during the time of the charter – not simply for the shipment at issue in this case.

The Agreement contains several references to the United States and Toledo specifically, including the following description of the M/V Inviken:

- The "[v]essel is fully equipped with the necessary gear and equipment required for transitting St. Lawrence Seaway, the Welland Canal and Great Lakes." JA 97. The Welland Canal runs between Lake Ontario and Lake Erie.

- "When the vessel trades within the waters of the Great Lakes, her fresh water, stores, lubricating oil and constant not to exceed 350 metric tons[,] and Master to endeavour to reduce fresh water whilst trading in the Great Lakes." *Id.*

- "Owners confirm that the vessel is suitable for Toledo." *Id.*

- FedNav, as the charterers, had "the option to crop and replace mast in order to safely trade to Toledo." *Id.* at 106.

In addition:

- The Charter Agreement contains three other references to the Great Lakes region. *See id.* at 99-100.

- Fednav is located in Montreal. The Charter Agreement only specifies two ports: one in Montreal, and the other in Toledo.

- Critically, *employees of the defendants concede that the vessels were rigged in order to travel to the Great Lakes.*[3]

---

[3]For example, Helge Lassesen, the Quality Assurance and Safety Manager of Viken Ship Management, provided the following deposition testimony regarding the Charter Agreement:

    Q: [T]he charter [states] . . . "Vessel is fully equipped with the necessary gear and equipment required

## II.        Specific Jurisdiction

The question of personal jurisdiction in this case is guided by Fed. R. Civ. P. 4(k)(2), which provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons . . . is also effective, with respect to the claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

To establish personal jurisdiction, a plaintiff must show that (1) the defendant had "'minimum contacts' with the forum state such that defendant should 'reasonably anticipate being haled into court there,'" and (2) "'the exercise of jurisdiction comport[s] with traditional notions of fair play and substantial[ ]justice.'"[4] The "'constitutional touchstone' of personal jurisdiction 'remains whether the defendant purposefully established minimum contacts in the forum state.'"[5] "In the Sixth Circuit, 'the emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state.'"[6]

The minimum contacts prong is satisfied either through specific or general jurisdiction. Specific jurisdiction "subjects the defendant to 'suit in the forum state only on claims that arise out of or relate to a defendant's contacts with the forum.'"[7] General jurisdiction is established "when a defendant has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims."[8] Because specific personal jurisdiction exists in this case based on defendants' contacts with Ohio, we do not address the requirements for general jurisdiction and the "national contacts" test.

---

> for transitting the St. Lawrence Seaway, the Welland Canal, and the Great Lakes" . . . is this an indication of where the vessel's going to be traveling to?
> A: Yes . . . **because various areas have specific requirements.** . . . It's indication [sic] that the vessel - **that we have to rig the vessel to traverse the Great Lakes.**"

Lassesen Dep. Tr. 72-73 (JA 182-83) (emphasis added).  Similarly, Thomas Steekmast, the Director of the Viken Shipping Group (a holding company for Viken Lakers), testified that the M/V Inviken "is lake fitted.  So, by definition, she is constructed so that she can trade into the lakes which is part of the description [in the Charter Agreement], I believe."  Steckmest Dep. Tr. 42 (JA 225); *see also id.* at 43 (JA 225).

[4]*Fortis*, 2005 WL 646092, at \*1 (quoting *Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) and *Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 793 (6th Cir. 1996)).

[5]*Id.* at \*2 (quoting *Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102, 108-09 (1987)).

[6]*Id.* (quoting *Bridgeport Music, Inc. v. Still N the Water Publ'g*, 327 F.3d 472, 479 (6th Cir. 2003)).

[7]*Id.* (quoting, *inter alia*, *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984) (additional citation and internal quotation marks omitted)).

[8]*Id.* (quoting *Aristech Chem. Int'l v. Acrylic Fabricators*, 138 F.3d 624, 627 (6th Cir. 1998)) (internal quotation marks omitted).

### A.        Purposeful Availment

####        1.        *Asahi*

The Supreme Court in *Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102 (1987) analyzed the purposeful availment test in detail.  Asahi was a Japanese company that manufactured tire valves, which it sold to a Taiwanese manufacturer of tire tubes.  Plaintiff was injured when the tire of his motorcycle equipped with an Asahi valve burst.  He sued Asahi in California.  The Court ruled that the district court lacked personal jurisdiction over Asahi, although no opinion commanded the support of a majority of the Court.

Justice O'Connor's plurality opinion held that the "placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State.  Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum state, for example, designing the product for the market in the forum state . . ." *Id.* at 112. This formulation came to be known as "stream of commerce plus."  In concluding that the district court lacked jurisdiction, the plurality opinion concluded that there was no evidence that Asahi "designed its product in anticipation of sales in California."  *Id.* at 113 (citation omitted).

As an example of purposeful design that presumably would meet the "stream of commerce plus" test, Justice O'Connor's opinion cited *Rockwell Int'l Corp. v. Costruzioni Aeronautiche Giovanni Agusta*, 553 F. Supp. 328 (E.D. Pa. 1982); *see Asahi*, 480 U.S. at 113.  In that case, an Augusta A-109 helicopter crashed over the Ohio River.  After plaintiff filed suit, the trial court considered whether it had personal jurisdiction over SNFA, a French manufacturer of ball bearings. These ball bearings were custom-designed exclusively for the A-109 helicopter, which was manufactured by Augusta, an Italian company.  SNFA knew that Augusta marketed its helicopters to the "executive corporate transport market" in the United States and Europe.  The district court found specific jurisdiction over SNFA, because SNFA designed the ball bearings exclusively for the A-109 helicopters, knowing that these helicopters would be sold in the United States (and other countries).  *Id.* at 331-32.

Finally, in support of its position, the *Asahi* plurality explained that application of the purposeful availment test is appropriate because a corporation then has

> clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.  Hence if the sale of a product . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, *directly or indirectly*, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States . . .

480 U.S. at 110 (emphasis added) (citations and internal quotation marks omitted).

####        2.        The District Court's Opinion

Applying the *Asahi* formulation, the district court acknowledged that defendants rigged their vessels to sail into the Great Lakes and call at Toledo's port.  However, the court concluded that it lacked personal jurisdiction over the defendants because the third-party charterer was Canadian. As explained below, the district court erred as a matter of law in ruling on this basis.

In its holding, the district court offered the following analysis:

> [Plaintiff] points to several provisions of the time charter specifying that the ship is suitable for Toledo's port. Designing a product specifically for a certain market suffices for an "intent or purpose to serve the market in the forum state." *Asahi*, 480 U.S. at 112. Fortis argues that this is exactly what Viken Lakers did when it promised the M/V Inviken would be suitable for the Port of Toledo.
>
> This contention is mistaken. Viken Lakers derives their income from providing ships to time-charterers, none of whom, it appears, are [sic] American. When Viken made this promise, it served to insure the business of a Canadian charter company, FedNav. An[ ]intent to serve the needs of a Canadian company is not an intent to serve the market of this forum. These clauses are, therefore, irrelevant for jurisdictional purposes. *See Carter v. Lagloria Shipping*, 1997 WL 423101 at *3 (E.D.La. July 24, 1997).

*Id.* at *3.

The district court thus erroneously injected a new requirement into the personal jurisdiction analysis. The relevant question is whether defendants purposefully availed themselves of the benefits of the forum state, Ohio. Defendants derived the same benefit – and hence their contacts with the forum state are the same – regardless of whether they were working with an American or a Canadian company.[9] Indeed, other shipping cases that have found personal jurisdiction over a foreign vessel owner have conspicuously failed to refer to whether the vessel operator was American or foreign. *See United States v. Pierre Point Shipping and Inv. Co.*, 655 F. Supp. 1379 (E.D. Va. 1987); *Mitsubishi Shoji Kaisha v. MS Galini*, 323 F. Supp. 79 (S.D. Tex. 1971). *But see Mutualidad Seguros del Instituto Nacional de Industria v. M.V. Luber*, 1999 AMC 824 (S.D.N.Y. 1998) (no jurisdiction over foreign vessel owner). Moreover, in the non-shipping context, we have repeatedly held, as have other courts, that a defendant's interposition of an independent middleman between itself and the forum does not by itself place the defendant outside of that forum's reach. *See Tobin v. Astra Pharm. Prods.*, 993 F.2d 528, 544 (6th Cir. 1993) ("[The defendant] cannot expect to rely solely on the use of an independent distributor to insulate it from suit."); *Mott v. Schelling & Co.*, 1992 U.S. App. LEXIS 13273, at *6 (6th Cir. May 29, 1992) ("'The use of an independent distributor . . . in and of itself, will not insulate a non-resident foreign corporation from suit.'") (quoting *Poyner v. Erma Werke Gmbh*, 618 F.2d 1186, 1190 (6th Cir. 1980)); *see also, e.g.*, *Pennzoil Prods. v. Colelli & Assoc.*, 149 F.3d 197, 203 (3d Cir. 1998) (observing that jurisdiction may be appropriate although defendant "does not come into direct contact with the forum state but does so through intermediaries"); *Renner v. Lanard Toys*, 33 F.3d 277, 282 (3d Cir. 1994) ("It [ ] appears from *Asahi* . . . that the absence of direct sales or shipments into the forum is not dispositive.").

From the foregoing, we conclude that the district court erred as a matter of law in ruling that it lacked jurisdiction because the charterer was not American. The district court did find, however, that defendants rigged its vessels to sail into the Great Lakes and Toledo. In light of this finding, we here analyze the purposeful availment test in greater detail.

### 3.     Sixth Circuit Caselaw on Purposeful Availment

The Sixth Circuit has adopted Justice O'Connor's "stream of commerce plus" test from *Asahi*. In *Bridgeport Music v. Still N the Water Publ'g*, 327 F.3d 472, 480 (6th Cir. 2003), "we ma[d]e clear . . . our preference for Justice O'Connor's stream of commerce 'plus' approach, for the

---

[9]The case cited by the district court is not to the contrary. *See Carter v. Lagloria Shipping*, 1997 WL 423101, at *3 (E.D. La. July 24, 1997). That case involved whether *general* jurisdiction existed, and defendants there had not rigged their vessels for U.S. ports or otherwise designed their products for the U.S. market.

reasons set forth in that opinion . . ." As explained below, the facts of this case meet the "plus" requirement under Sixth Circuit precedent.

The case of *Mott v. Schelling & Co.*, 1992 U.S. App. LEXIS 13273 (6th Cir. May 29, 1992) is instructive. *See also Tobin v. Astra Pharm. Prod.*, 993 F.2d 528, 544 (6th Cir. 1992) (favorably discussing *Mott*). Mott was injured in Michigan while operating an industrial saw manufactured by Schelling, an Austrian-based company. Mott and members of his family sued, *inter alia*, Schelling, which moved to dismiss the complaint for lack of personal jurisdiction. In outlining the requirements of the purposeful availment test, the *Mott* court held that "even a single act can support jurisdiction as long as it creates the required relationship with the forum state." *Mott*, 1992 U.S. App. LEXIS 13273, at *11 (citing *McGee v. Int'l Life Ins. Co.*, 335 U.S. 220, 223 (1957)).

Schelling argued that it was not subject to the specific jurisdiction of the Michigan courts because it had no relevant contacts there. The offending saw was sold to Schelling's U.S.-based agent the Proctor Corporation in Birmingham, Alabama, at which point Proctor obtained (and Schelling lost) title to the saw. The court of appeals noted that Schelling "actively cultivated its American market. *United States standards were taken into account in the design and manufacture of the saw at issue*." *Id.* at *15 (emphasis added). Schelling's employees had come to the United States to market and sell these machines; the court did not state that they marketed in Michigan specifically. In addition, a Schelling technician went to the plant in Michigan to install the saw and demonstrate the blade-change procedure.

The appellate court concluded that specific personal jurisdiction existed over Schelling in Michigan. It held that Schelling "had to know" that the saw was destined for Michigan because it sent one of its technicians there. Moreover,

> Schelling knew its saws were being sold in the United States. The company actively cultivated its market here, and benefited from numerous U.S. sales, including the one in this case, over many years. Clearly Schelling cannot reasonably expect to sell a potentially dangerous product into the United States, exact its price, and then shirk any obligations that arise when its machine goes awry. Due process does not require us to allow Schelling to exploit this country's vast, rich markets and at the same time avoid the jurisdiction of our courts. Under any formulation of the test, the district court properly exercised personal jurisdiction over Schelling.

*Id.* at *17-18.

The court's ruling in *Mott* is noteworthy because it found sufficient contacts with Michigan based on sales to its distributor in Alabama. Schelling undoubtedly knew that its saw could end up in Michigan through the stream of commerce. Yet the only specific contact with Michigan (as opposed to the United States) that would qualify as a "plus" factor in the *Asahi* formulation is the technician's installation of the saw in Michigan and demonstration of the blade-changing technique.

In this case, defendants outfitted and rigged their ships to sail into the Great Lakes. Defendants confirmed in the Charter Agreement that "the vessel is suitable for Toledo." JA 97. Defendants' officers testified that the vessels were rigged to travel to the Great Lakes. They entered into a long-term agreement with a charterer that made its money shipping into the Great Lakes. Not counting travel time, they earned $558,000 for the number of days spent in Ohio ports over five years. Defendants had more than sufficient notice that they might be subject to jurisdiction here,

and had ample opportunity to pass on the costs of potential liability to FedNav if they desired, or to require that FedNav avoid United States ports completely.[10]  *See Asahi*, 480 U.S. at 110.

Defendants argue that the vessels were rigged to travel to countries other than the United States, and that the Great Lakes serves both the United States and Canada.  Under the *Asahi* formulation, however, the crucial question is whether defendants designed their product for or directed their products to the forum state – not whether the United States was the exclusive market for the defendants' products.  *See Asahi*, 480 U.S. at 113 (citing *Rockwell*, discussed *supra* Part II.A.1.) (jurisdiction appropriate when custom-made ball bearings used in helicopters were sold in United States and Europe).

In sum, defendants rigged their vessels to ship products to the Great Lakes ports, including Toledo.  Pursuant to *Asahi* and *Mott*, this, plus the frequent calls to these ports, is sufficient to establish purposeful availment of the forum state.

## B.      Arise out of Actions in Forum State

The second consideration in the minimum contacts test is whether the cause of action arose out of the defendant's activities in the forum state.  Despite finding insufficient contacts with Ohio, the district court concluded that Fortis's cause of action did arise out of actions in the forum state.  It acknowledged that the event that caused the leak, the leak itself, and the damage to the steel coils all occurred at sea before reaching Toledo.  Yet, according to the district court, "[w]hat [the defendants] again cannot escape is that this entire case is in this court only because their ship delivered cargo to Toledo.  Therefore, this criterium is satisfied."  2005 WL 646092, at *2.

The Sixth Circuit establishes a "lenient" threshold for meeting this requirement.  *See Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002).  In *Bird*, the court considered whether a plaintiff's cause of action arose in Ohio when the pro se plaintiff alleged the defendants – all of whom were non-Ohio residents – misappropriated his domain name in violation of copyright and trademark laws. Defendant Dotster was a registrar of internet domain names.  After the district court dismissed the case for lack of jurisdiction, plaintiff appealed, and the court of appeals reversed.  It noted that the "only factual allegations that connect [the Dotster defendants] in any way to Ohio" are as follows: the Dotster defendants admit they have sold approximately 233,333 internet domain names to United States customers, which, when divided by 50, means that on average they sold about 4,666 domain names to each state, including Ohio.  *Id.* at 872.  The court concluded that this satisfied the purposeful availment test.

The court then considered whether plaintiff's claims arose out of the Dotster defendants' contacts with Ohio.  The court held that the "arising out of" factor "requires only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities.'"  *Id.* at 875 (quoting in part *Third Nat'l Bank v. WEDGE Group*, 882 F.2d 1087, 1091 (6th Cir. 1989)).  The court concluded that the actions of the Dotster defendants in registering a third party's domain name constituted sufficient connection with Ohio.  The court held that "the operative facts are at least marginally related to the alleged contacts between the Dotster defendants and Ohio."  *Id.*  The

---

[10]The district court and defendants rely on the case of *Mutualidad Seguros del Instituto Nacional de Industria v. M.V. Luber*, 1998 WL 1108936 (S.D.N.Y. Sept. 25, 1998) to argue that defendants only owned the vessels and did not purposefully call on U.S. ports.  That case held that a foreign owner of a shipping vessel cannot be subject to the jurisdiction of U.S. courts because it has no control over where the vessels sail.  This holding is inconsistent with Sixth Circuit precedent.  *See, e.g.*, *Mott*, *supra*.  It is also at odds with cases that have found jurisdiction over a foreign vessel owner that charters its boats to a third party.  *See United States v. Pierre Point Shipping and Inv. Co.*, 655 F. Supp. 1379 (E.D. Va. 1987); *Mitsubishi Shoji Kaisha v. MS Galini*, 323 F. Supp. 79 (S.D. Tex. 1971).

court reached this conclusion even though the only factual connection to Ohio related to plaintiff's claim was that the plaintiff lived there and was harmed there.

In this light, the factual allegations here are sufficient to establish that the claims arose out of activities in the forum state. The alleged harm ultimately suffered by plaintiff, and arguably the breach of bailment obligations, occurred in Ohio when defendants' ship delivered rusted steel coils to Toledo. The facts in this case are sufficient under *Bird* and this Circuit's "lenient" standard to meet the "arising under" test.

### C.     Reasonableness

As part of the minimum contacts test, courts lastly consider whether exercising jurisdiction would be reasonable. "Whether the exercise of jurisdiction over a foreign defendant is reasonable is a function of balancing three factors: 'the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief.'" *City of Monroe Employees Ret. Sys. v. Bridgestone*, 399 F.3d 651, 666 (6th Cir. 2005) (quoting *Asahi*, 480 U.S. at 113). "This circuit has already observed that where the first two criteria [of the minimum contacts test] are satisfied, only the unusual case will not meet th[e] third criterion [of reasonableness]." *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 628 (6th Cir. 1998) (citations and internal quotation marks omitted).

However, "'great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field . . . the unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.'" *City of Monroe*, 399 F.3d at 666 (quoting *Asahi*, 480 U.S. at 115, 114).

Cognizant of this admonition, jurisdiction is nevertheless reasonable here. The parties have already demonstrated an ability to conduct discovery with little difficulty across borders, and most (if not all) of the relevant witnesses speak English. Ohio as a forum has a strong interest in ensuring that shipments to its ports are reliable. Finally, the plaintiff's interest in obtaining relief here is particularly keen, because (in contrast to *City of Monroe*) plaintiff only sued foreign defendants (and not U.S. parties), which is its only means for obtaining relief. Balancing these three factors, it is reasonable to exercise jurisdiction over defendants.

## III.     Conclusion

For the foregoing reasons, the district court's grant of summary judgment in favor of the defendants for lack of personal jurisdiction is REVERSED, and the case is REMANDED to the district court for further proceedings.